IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    Petitioner,

v.

TIMOTHY WARD, *in his official capacity as Commissioner of the Georgia Department of Corrections*,

    Respondent.

CIVIL ACTION FILE NO.:

1:22-cv-1653-SCJ-JKL

## FINAL REPORT AND RECOMMENDATION

The United States of America brought this action under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"), to enforce an administrative subpoena issued by the United States Department of Justice ("DOJ") to Respondent Timothy Ward, the Commissioner of the Georgia Department of Corrections ("GDC"), seeking documents relating to correctional facilities throughout Georgia. The case is presently before the Court on the United States' petition to enforce the subpoena [Doc. 1] and GDC's motion for entry of a confidentiality protective order [Doc. 15]. After careful consideration of the record

and the parties' briefs, and with the benefit of oral argument, it is **RECOMMENDED** that the petition be **GRANTED IN PART** and the motion for protective order be **DENIED**.

## I.    BACKGROUND

CRIPA authorizes DOJ to investigate conditions of confinement in correctional facilities to ensure compliance with the United States Constitution and federal law. *See* 42 U.S.C. § 1997a-1. In February 2016, DOJ opened a CRIPA investigation into whether the State of Georgia and GDC had failed to protect lesbian, gay, bisexual, transgender, and intersex ("LGBTI") inmates from sexual harassment, sexual abuse, and sexual assault by GDC staff and other prisoners. (Decl. of Matthew Nickell [Doc. 1-2] ¶ 2.) In a letter dated February 5, 2016, DOJ advised the State of Georgia about the purpose of that investigation, stating that:

> In conducting the investigation, [DOJ] will determine whether there are systemic violations of the Constitution of the United States. Specifically, we will investigate whether Georgia adequately protects transgender and gay prisoners in its custody from sexual abuse, sexual harassment, and assault by other prisoners and staff.

[Doc. 1-6 at 1.[1]] GDC participated in this investigation. (*See* Decl. of Jennifer Ammons [Doc. 14-2] ¶ 7.)

---

[1] The Court's citations to the record refer to the page numbers generated by the Court's electronic filing system.

On September 14, 2021, DOJ notified the State of Georgia that it was expanding the investigation to determine whether the State had also failed to protect prisoners housed at close and medium security levels from harm due to prisoner-on-prisoner violence.  (Nickell Decl. ¶ 3.)  [Doc. 1-7.]  In a notice letter from DOJ to the State, DOJ stated:

> In conducting the investigation, we will determine whether there are systemic violations of the Constitution of the United States. Specifically, we will investigate whether GDC is engaging in a pattern or practice of violating the constitutional rights of convicted prisoners housed at GDC's close- and medium-security level facilities, by failing to protect them from harm due to violence by other prisoners. Additionally, we will continue to investigate whether GDC adequately protects [LGBTI] prisoners from sexual harassment, sexual abuse, and sexual assault by GDC staff and other prisoners, pursuant to our open investigation, of which we provided notice on February 5, 2016.

[Doc. 1-7 at 1.]  According to GDC, this request came as a surprise because, since 2016, DOJ had not requested documents or other information related to the initial investigation, sought to visit any GDC institution, or indicated that it was concerned about the safety of LGBTI inmates.  (Ammons Decl. ¶ 9.)

On September 24, 2021, DOJ sent a request for documents to counsel for GDC, seeking information related to prisoner-on-prisoner violence and updated information about the treatment of and potential harm to LGBTI inmates.  (Nickell Decl. ¶ 6); [Doc. 1-8 (request for documents)].  GDC provided only a "small

subset" of the documents requested, and some of those were produced in non-native format that did not preserve the original files' metadata. (Nickell Decl. ¶¶ 7-12.)

Over the following months, counsel for DOJ and GDC conferred about the September 24, 2021 request for documents; however, they reached an impasse on several issues. (Nickell Decl. ¶ 13.) Most critically, GDC insisted that DOJ sign a nondisclosure agreement due to the sensitive and confidential nature of documents requested by DOJ; however, despite their efforts to negotiate a mutually-acceptable agreement, they were unable to do so. (*Id.* ¶¶ 14-35; Decl. of Stephen Rogers [Doc. 14-9] ¶¶ 6-23.)

On December 14, 2021, DOJ issued and served a subpoena on GDC, pursuant to CRIPA, formally demanding that GDC provide access to the documents sought in the September 24, 2021 request. (*See* Nickell Decl. ¶¶ 52-53.) [*See also* Doc. 1-4, 1-5 (subpoena).] On January 14, 2022, the compliance date for the subpoena, counsel for GDC emailed a six-page letter and a 34-page attachment objecting to the subpoena. (*See* Nickell Decl. ¶¶ 59-60; Rogers Decl. ¶ 26); [*See also* Docs. 1-26 (letter), 1-27 (objections)]. In it, GDC offered to produce documents pursuant to a stipulated protective order similar to a protective order to which DOJ had agreed to in a prison conditions case pending in the Northern

District of Alabama. (Rogers Decl. ¶ 27.) Counsel for the parties continued to confer in an attempt to negotiate a resolution to their dispute over GDC's objections; however, their discussions again proved fruitless. (*See id*. ¶¶ 29-42.)

On March 28, 2022, the United States filed the instant action to enforce the subpoena. [Doc. 1.] On April 26, GDC filed a response in opposition [Doc. 14], as well as a motion for entry of a confidentiality protective order [Doc. 15]. On May 3, the United States filed a reply in support of its petition [Doc. 16], and on May 10, it filed a response in opposition to GDC's motion for a protective order [Doc. 17]. On May 24, GDC filed a reply in support of its motion for protective order. [Doc. 18.] On June 7, at the direction of the Court, the parties filed supplemental briefing concerning this Court's authority to enforce the subpoena under CRIPA's venue provision, 42 U.S.C. § 1997a-1(b)(2). [Docs. 30, 31.] Finally, on June 10, 2022, I held a hearing on the pending motions. The motions are now ripe for review.[2]

---

[2] Because the undersigned's resolution of the pending motions will be dispositive of the entire matter before the Court, I resolve these motions by report and recommendation. *See EEOC v. Austal USA, LLC*, No. MC 17-00006-WS-MU, 2017 WL 4563078, at *1 n.1 (S.D. Ala. Aug. 18, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 4562634 (S.D. Ala. Oct. 12, 2017).

## II.     DISCUSSION

I organize my analysis as follows.  First, I address the threshold issues of whether this Court has subject matter jurisdiction to rule on the motion to enforce the subpoena and whether venue is appropriate in the Northern District of Georgia. After answering these questions in the affirmative, I turn to GDC's objections to particular requests.  Finally, I take up GDC's motion for a confidentiality protective order, and conclude that despite the confidential and sensitive nature of the information that GDC is being asked to produce, a protective order is not warranted because CRIPA's default provisions provide adequate protection against misuse and improper disclosure.

### A.     This Court's Authority to Enforce the Subpoena

CRIPA authorizes DOJ to "require by subpoena access to any institution . . . and to any document, record, material, file, report, memorandum, policy, procedure, investigation, video or audio recording, or quality assurance report relating to any institution" that is subject to investigation under CRIPA.  42 U.S.C. § 1997a-1(a).  The statute further provides that "[i]n the case of contumacy or failure to obey a subpoena issued under [CRIPA], the United States district court for the judicial district in which the institution is located may issue an order requiring compliance."  *Id.* § 1997a-1(b)(2).  The term "institution," meanwhile, is

defined, in part, as "any facility or institution . . . which is owned, operated, or managed by, or provides services on behalf of any State or political subdivision of a State; and . . . which is . . . a jail, prison, or other correctional facility. *Id.* § 1997(1)(A).

The subpoena at issue in this case seeks information about prison facilities. The United States contends this Court can enforce the subpoena because (1) GDC has waived any objection to venue by not asserting a defense of improper venue by motion and by affirmatively seeking entry of a statewide protective order; and (2) even if it had not waived an objection to venue, all the documents requested in the subpoena, including those relating to institutions outside the Northern District of Georgia, relate to GDC as a whole, and GDC has possession and ultimate control over production of virtually any document sought in the subpoena. [Doc. 29.]

GDC, meanwhile, argues that because the statute refers to "*the* United States district court for *the* judicial district in which *the* institution is located," the enforcement provision of CRIPA contemplates enforcement only on a facility-by-facility basis, as opposed to a single proceeding to enforce a subpoena for documents relating to multiple facilities. [*See* Doc. 30 at 2-5]; *see also* 42 U.S.C. § 1997a-1(b)(2) (emphasis added). In GDC's view, only the district court where

the facility being investigated is located has subject matter jurisdiction to hear an action to enforce a CRIPA subpoena. [Doc. 30 at 2-5.] Applying this logic to the subpoena at issue here, GDC contends that its requests fall into one of three categories: (1) requests that seek systemwide documents that uniformly relate to all GDC facilities, including those in the Northern District of Georgia; (2) requests that seek facility-specific information for facilities located in the Northern District of Georgia; and (3) requests for facility-specific documents that relate to facilities outside the Northern District of Georgia. [*Id.* at 6.] GDC concedes this Court may properly rule on the enforceability of the first two categories of requests because they relate to institutions in this District. [*Id.* at 6-7.] But as to the third, GDC argues that this Court lacks subject matter jurisdiction to enforce the subpoena in light of the language in the statute. [*Id.* at 7-10.]

The United States has the better of the arguments. First of all, this Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, which grants the Court subject matter jurisdiction over all cases arising under a law of the United States, and 28 U.S.C. § 1345, which grants federal courts subject matter original jurisdiction over "proceedings commenced by the United States," "except as

otherwise provided by Act of Congress."[3] *United States v. Hill*, 694 F.2d 258, 269 (D.C. Cir. 1982) (identifying 28 U.S.C. §§ 1331 and 1345 as statutes providing subject matter jurisdiction for proceedings to enforce administrative subpoenas issued by Department of Energy). Obviously, the case at bar is a proceeding commenced by the United States, and it arises under an act of Congress, namely CRIPA.

To the extent that GDC contends that Congress intended to specifically limit subject matter jurisdiction to a particular subset of district courts, the undersigned disagrees. "To determine whether Congress intended to repeal a district court's Section 1345 jurisdiction over a particular case or controversy, the court first analyzes the express terms of the statute itself, here [§ 1997a-1(b)(2)] and then turns to the statute's legislative history." *United States ex rel. Borges v. Doctor's Care Med. Ctr., Inc.*, No. 01-8112-CIV, 2007 WL 9702639, at *7 (S.D. Fla. Jan. 29, 2007); *see also Colo. River Water Conservation Dist. v. United States,* 424 U.S.

---

[3] The United States also argues that this Court has subject matter jurisdiction under 28 U.S.C. § 1343, which provides that "[t]he district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person" to address the possible deprivation of constitutional rights under color of state law. The former Fifth Circuit held, however, that the United States is not a "person" under that statute. *United States v. City of Jackson, Miss.*, 318 F.2d 1, 8 (5th Cir. 1963). Section 1343, therefore, does not apply here.

800, 807-09 (1976); *United States v. Puerto Rico*, 721 F.2d 832, 834-38 (1st Cir. 1983); *see also* Wright & Miller, 14 Fed. Prac. & Proc. Juris. § 3651 (4th ed.) ("[T]he statutory exception must be clear before a federal court will deny jurisdiction under Section 1345.") (footnote omitted). "If neither indicates an intent to repeal [the district court's jurisdiction], the court asks whether (1) the subject statute is in 'irreconcilable conflict' with 28 U.S.C. § 1345, and (2) whether the statute 'covers the whole subject of 28 U.S.C. § 1345's grant of jurisdiction over the particular case and is clearly intended as a substitute for 28 U.S.C. § 1345 jurisdiction.'" *Ex rel. Borges,* 2007 WL 9702639, at *7 (cleaned up); *see also* Wright & Miller, 14 Fed. Prac. & Proc. Juris. § 3651 (4th ed.) ("Courts have found a repeal when the specialized statute contains a unified, integrated, self-contained grant of jurisdiction that can be read as setting out a complete scheme for federal jurisdiction over cases in which a particular agency is a plaintiff, and when the later-enacted statute shows an irreconcilable conflict with Section 1345." (quotation marks and footnotes omitted)).

Applying those principles here, § 1997a-1(b)(2) does not clearly show that Congress intended to supplant the general grant of subject matter jurisdiction when enacting CRIPA. Congress did not use language that clearly expressed that it

intended to narrow a federal court's subject matter jurisdiction in cases such as the one at bar, and nothing in the legislative history suggests that Congress meant to do so either. *See, e.g.,* 155 Cong. Rec. S10852-01, S10854 (Oct. 28, 2009). Nor can it reasonably be said that any irreconcilable conflict exists between § 1997a-1(b)(2) and § 1345; indeed, any potential conflict can be avoided by reading § 1997a-1(b)(2) as a venue statute. The Second Circuit's decision in *United States ex rel. Thistlwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861 (2d Cir. 1997), is instructive in this regard. In that case, the court addressed a provision of the False Claims Act, 31 U.S.C. § 3732(a), which states that "any action . . . may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found . . . ." *Id.* at 866. The court reasoned that the statute does not speak in terms of jurisdiction, and distinguished it from other federal statutes that explicitly referred to "jurisdiction." *Id.* The court also found nothing in the statute's legislative history that signaled Congress's intent to read the statute as limiting a district court's subject matter jurisdiction. *Id.* at 866-68. Based upon the foregoing, the court found "no basis . . . for reading into that

section a limitation on the district court's subject matter jurisdiction." *Id.* at 868. The same reasoning applies to the Court's subject matter jurisdiction in this case.[4]

The nature of CRIPA investigations lends further support to the conclusion that Congress did not intend for § 1997a-1(b)(2) to limit a district court's subject matter jurisdiction. Critically, § 1997a-1(b)(2) leaves unaddressed situations like the one at bar where DOJ seeks materials relating to multiple institutions in a single

---

[4] GDC relies on *N.L.R.B. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198, 1200 (D.C. Cir. 2006), to support its position that 42 U.S.C. § 1997a-1(b)(2) confers subject matter jurisdiction for actions to enforce CRIPA administrative subpoenas. In *Cooper Tire*, the D.C. Circuit dismissed an action that the National Labor Relations Board ("NLRB") brought in the District of Columbia to enforce an administrative subpoena relating to an investigation pending in Mississippi. The court reasoned that the National Labor Relations Act ("NLRA") permitted the NLRB to apply to enforce a subpoena only in the district where the investigation was "carried on," and, therefore, the U.S. District Court for the District of Columbia "lacked subject matter jurisdiction to enforce the subpoenas" at issue. *Id.* at 1204. *Cooper Tire* did not address the interplay between § 1345 and the relevant provisions of the NLRA. Moreover, the statute at issue in *Cooper Tire*, 29 U.S.C. § 161(2), referred explicitly to "jurisdiction," providing that "any district court of the United States . . . within the jurisdiction of which the inquiry is carried on . . . ***shall have jurisdiction***" to enforce the subpoena) (emphasis added). Section 1997a-1(b)(2) makes no mention of the word "jurisdiction."

GDC also cites cases arising under the Federal Arbitration Act ("FAA"); however, it is well-settled that the FAA "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 [] or otherwise." *Moses H. Cone Mem'l Hops. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983). In addition, none of the arbitration cases that GDC cites involved an action brought by the United States. Those arbitration cases are, therefore, inapposite.

subpoena as part of a state-wide investigation. In addition, forcing DOJ and the targets of its investigation to litigate issues in a piecemeal, district-by-district fashion could result in inconsistent outcomes, encourage forum shopping, tax precious resources for all parties, and disrupt the orderly flow of a state-wide investigation—all of which would frustrate CRIPA's goal of providing DOJ subpoena power to collect information to aid in its investigations of correctional institutions.

For all these reasons, in the Court's view, CRIPA's enforcement provision speaks to venue, not subject matter jurisdiction. *See* 42 U.S.C. § 1997a-1(b)(2); *see also United States v. Hankins*, 581 F.2d 431, 438 n.11 (5th Cir. 1978) (holding that District Court had subject matter jurisdiction over petitions to enforce IRS summonses under 26 U.S.C. § 7402(a) and 28 U.S.C. § 1345, and that 26 U.S.C. § 7402(b), which grants "jurisdiction" to "the district court of the United States for the district in which such person resides or may be found" governs venue); *see also Hill*, 694 F.2d at 267-68 ("The exception to section 1345 is interpreted narrowly, and the section's language evinces Congress' intent to confer jurisdiction over any form of action that the United States might initiate.").

Having concluded that § 1997a-1(b)(2) pertains to venue, the next issue is whether venue is appropriate in this forum. On this point, the Court again agrees with the United States. Even if GDC had a viable argument that the appropriate venue to enforce portions of the subpoena lies in the Middle or Southern Districts of Georgia, GDC has waived the issue. Federal Rule of Civil Procedure Rule 12(h)(1) provides that, in general, a party waives a defense to improper venue by not raising the issue in a motion or responsive pleading.[5] In its response, GDC did not assert lack of venue as a defense, nor did it move to dismiss for improper venue. Rather, GDC's only mention of venue appears in a footnote in its response brief, which states that GDC does not "waive any objection to the venue of this or any other action or proceeding seeking an interview, site visit, or document production in a judicial district where the interviewee, facility, or documentation is not physically located or where any inconvenience exists to Commissioner Ward, GDC, or any other person or entity." [Doc. 14 at 10 n.3.] While this language seeks to *reserve* the right to make an objection, GDC did not actually assert any substantive

---

[5] Rule 81(a)(5) provides that the Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute," except in specific circumstances not applicable here. As a result, Rule 12 applies to this action.

objection to venue in its response. Thus, it has waived any such objection under Rule 12(h)(1). In addition, GDC has affirmatively sought the entry of a protective order that would apply to the production in its entirety—that is, it sought statewide application of its protective order; thus, GDC has availed itself of this Court's authority to issue an order that is inconsistent with its view that venue does not lie here. [Doc. 15.]

In sum, the Court finds that this Court has subject matter jurisdiction over this case and that venue is appropriate in this District.

## B.    The Enforceability of the Subpoena

The next issue is the enforceability of the subpoena. GDC contends that the petition should be denied because the subpoena seeks information that is irrelevant to DOJ's pending investigation of Georgia's penal institutions and because GDC has already produced many documents within its possession. [Doc. 14 at 19, 35-41, 41-42.]

In *United States v. Morton Salt Co.*, the Supreme Court recognized that agencies of the United States have broad investigatory powers:

> Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not

derived from the judicial function.  It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.  When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

338 U.S. 632, 642-43 (1950).  As a result, "[a] district court's role in a proceeding to enforce an administrative subpoena is limited."  *E.E.O.C. v. Tire Kingdom, Inc.*, 80 F.3d 449, 450 (11th Cir. 1996) (citing *E.E.O.C. v. Kloster Cruise Ltd.*, 939 F.2d 920, 922 (11th Cir. 1991)).

To determine whether an administrative subpoena is enforceable, courts consider "(1) whether the administrative investigation is within the agency's authority, (2) whether the agency's demand is too indefinite, and (3) whether the information sought is reasonably relevant."  *Tire Kingdom*, 80 F.3d at 450; *McLane Co. v. E.E.O.C.*, __ U.S. __, 137 S. Ct. 1159, 1165 (2017), *as revised* (Apr. 3, 2017) ("If the charge is proper and the material requested is relevant, the district court should enforce the subpoena unless the [recipient] establishes that the subpoena is 'too indefinite,' has been issued for an 'illegitimate purpose," or is unduly burdensome.").  "So long as the agency makes a plausible argument in support of its assertion of jurisdiction, a district court must enforce the subpoena if the

information sought there is not plainly incompetent or irrelevant to any lawful purpose of the agency." *Kloster*, 939 F.2d at 922 (citations omitted).

In its briefs, GDC cites a slightly different, four-factor test set forth in the Supreme Court's decision in *Powell v. United States*, 379 U.S. 48, 51 (1964). [*See* Doc. 14 at 15.] In *Powell*, the government sued a taxpayer to enforce an IRS summons for tax records that the taxpayer refused to produce. 379 U.S. at 51. The principal issue in the case was whether the IRS was required to establish probable cause that tax fraud occurred in order to support a summons for the individual's tax documents. The relevant provision of the Internal Revenue Code authorizing the issuance of summons provided as follows:

> No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

*Id.* at 53 (citing 26 U.S.C. § 7605(b)).[6] The Court held that the statute did not impose a probable cause standard, reasoning that nothing in the legislative history of the statute suggested such a requirement was intended. *Id.* at 56. But, focusing

_____

[6] Since *Powell* came down, § 7605(b) has been amended; however, for present purposes, those amendments are inconsequential.

on the first clause of § 7605(b)—that "no taxpayer shall be subjected to unnecessary examination or investigations"—the Court explained that the language "appear[s] to require that the information sought is not already within the Commissioner's possession" but that "its primary purpose was no more than to emphasize the responsibility of agents to exercise prudent judgment in wielding the extensive powers granted to them by the Internal Revenue Code." *Id.* The Court then went on to identify four factors the Commissioner of Internal Revenue must satisfy to enforce an IRS summons:

> He must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the [IRS] Commissioner's possession, and [4] that the administrative steps required by the [Internal Revenue] Code have been followed—in particular, that the 'Secretary or his delegate,' after investigation, has determined the further examination to be necessary and has notified the taxpayer in writing to that effect.

*Id.* at 57-58.

The *Powell* criteria have been applied to other subpoena enforcement actions, especially SEC subpoenas. *See SEC v. Marin*, 982 F.3d 1341, 1352 (11th Cir. 2020) (collecting cases). But it is clear that *Powell* does not apply to all actions to enforce administrative subpoenas. Notably, the Fifth Circuit has cautioned against blindly applying *Powell* in all actions, explaining that "principles

established in tax cases, and most notably in [*Powell*] cannot be indiscriminately applied to other agencies." *In re E.E.O.C.*, 709 F.2d 392, 398 n.2 (5th Cir. 1983). In the Eleventh Circuit, meanwhile, courts have applied the seemingly less onerous three-part standard discussed above. *See*, *e.g.*, *Inspector Gen. of U.S. Dep't of Agric. v. Glenn*, 122 F.3d 1007, 1009 (11th Cir. 1997) (subpoena issued under Inspector General Act of 1978, 5 U.S.C. § App'x 3 § 6); *Tire Kingdom, Inc.*, 80 F.3d at 450 (EEOC subpoena); *United States v. Fla. Azalea Specialists*, 19 F.3d 620, 623 (11th Cir. 1994) (administrative subpoena issued pursuant to Immigration Reform and Control Act of 1986, 8 U.S.C. § 1324b); *Fed. Election Comm'n v. Fla. for Kennedy Comm.*, 681 F.2d 1281, 1284 (11th Cir. 1982) (Federal Election Commission subpoena); *N.L.R.B. v. Lear Corp. EEDS & Interiors*, No. CV 16-00061-WS-N, 2016 WL 11397056, at *4 (S.D. Ala. May 10, 2016) (NLRB administrative subpoenas), *report and recommendation adopted*, No. CV 16-0061-WS-N, 2016 WL 3383284 (S.D. Ala. June 17, 2016); *Fed. Trade Comm'n v. LabMD, Inc.*, No. 1:12-CV-3005-WSD, 2012 WL 13104826, at *3 (N.D. Ga. Nov. 26, 2012) (FTC administrative subpoena).

The parties do not cite, and the Court has not found, any authority applying *Powell* in a CRIPA subpoena enforcement action. Nor does either party provide a

fulsome discussion about which standard applies here. But at oral argument, the parties appeared to agree that for present purposes, it is immaterial which standard applies because the determinative issue, which is common to both tests, is whether specific provisions of the subpoena seek information that is irrelevant to the CRIPA investigation.[7] Accordingly, the analysis that follows focuses on the relevancy of the requests—a factor common to whichever standard might apply.

The Court therefore turns next to the specific objections raised by GDC to requests. The thrust of GDC's arguments is that the United States impermissibly

---

[7] GDC concedes that the first and fourth *Powell* factors—*i.e.*, that the investigation is being conducted pursuant to a legitimate purpose and that DOJ complied with the necessary administrative steps—are not at issue. Citing the third *Powell* factor—whether the information sought is already in the government's possession—GDC argues that DOJ "possesses no authority to subpoena" documents that GDC has already produced. [Doc. 14 at 41-42.] At oral argument, counsel for the United States stated that it was not seeking re-production of documents that it had already obtained informally from GDC, so this issue is moot. In any event, even if the subpoena facially seeks information that GDC already provided, it appears that there are far more documents that GDC has refused to produce. Thus, the third *Powell* factor—assuming it even applies—weighs in favor of enforcing the subpoena. *See Azis v. U.S. I.R.S.*, 522 F. App'x 770, 775-76 (11th Cir. 2013) (upholding grant of petition to enforce IRS summonses where "at least some of the information requested . . . was not already in the possession of the IRS"); *S.E.C. v. Horowitz & Ullman P.C.*, No. C80-590A, 1982 WL 1576, at *13 (N.D. Ga. Mar. 4, 1982) (Forrester, J.) (finding SEC "subpoenas as a whole [were] not harassing" even though some documents were already in the government's possession).

seeks information that is immaterial to the pending investigation and, therefore, the Court should narrow the scope of the requests accordingly. The requests at issue include: requests for COVID-19 vaccination rates for prison staff and inmates; various categories of information pertaining to all institutions statewide; information about every employee who left GDC since September 2019; data from "SCRIBE," GDC's internal recordkeeping system; and a full spectrum of prisoner handbooks, orientation materials, and educational materials. GDC also complains that the United States improperly insists that information be produced in a technical format that is unduly burdensome. I take up each of these topics in turn.

### 1. Request for COVID-19 Vaccination Rates

Request No. 26 seeks "COVID-19 vaccination rates and statistics for all Staff and prisoners (specifying whether the rates reflect full or partial vaccination)." [Doc. 1-5 at 8.] GDC contends that this request is not related to purpose of DOJ's investigation into either the protection of LGBTI inmates or the protection of inmates at close and medium security facilities from violence. [Doc. 14 at 37.] At oral argument, counsel for the United States stated that the United States would not persist in its request for vaccination rate information. Because the United States has abandoned this request, GDC should not be ordered to produce information responsive to it.

21

## 2. Requests for Information Related to "All" Facilities

GDC argues that Requests 8, 9, 16, 17, and 18 seek statewide documents beyond the scope of the investigations into the protection of LGBTI inmates or inmates at close and medium security facilities:

> 8. Number of budgeted security positions at each facility, broken down by title, salary range for each position title, and overall security staff budget per facility, for the current fiscal year and previous fiscal year.

> 9. A list of, or documentation identifying, all security, medical, mental health, or supervisory Staff who have left employment with GDC in the past year, for any reason, including each person's name, title, date their employment began with GDC, date their employment ended, and reason for departure.

> \* \* \*

> 16. Incident reports; any supplemental reports; any related investigation files and reports; and any related video footage, witness statements, and other supporting materials related to any prisoner housed at any GDC facility, from September 1, 2019 to the present for all of the following:

> a. Homicides and suspected homicides;

> b. Alleged sexual abuse;

> c. Calls to GDC Special Operations, including any CERT Team or Tactical Squad calls, to respond to a riot, escape, or disturbance; and

> d. Calls to outside law enforcement.

For all of the requested incident reports and investigation files, please identify any prisoners involved who GDC has identified as LGBTI or [gender-nonconforming ("GNC")].

17. All autopsy or coroners' records, or all records determining a prisoner's cause of death, for all deaths reported in Document Request 1[6].a., above.

18. Total number of prisoner-on-prisoner homicides and suspected homicides throughout GDC, listed by year and by facility, from 2011 to the present.

[Doc. 1-5 at 5-6.] GDC argues that these requests "appear irrelevant" because they ask information for **all** GDC facilities without limitation, even though—according to GDC—DOJ itself represented to GDC that it was investigating the constitutional rights of inmates housed at GDC's close and medium security level facilities. [Doc. 14 at 36-37; *see also* Doc. 1-7 at 1 (Sept. 14, 2021 letter describing scope of CRIPA investigation).] In response, the United States contends that conditions at GDC's close and medium security level facilities are only a part of the investigation, which also extends "into whether GDC was protecting [LGBTI] prisoners from sexual harassment and abuse" regardless of the security level of any particular facility. [Doc. 16 at 14.]

"The measure of relevance used in subpoena enforcement actions is quite broad." *Fla. Azalea*, 19 F.3d at 624; *see also Marin*, 982 F.3d at 1355. A request "will survive a relevancy challenge so long as it 'touches a matter under

investigation.'" *Marin*, 982 F.3d at 1355 (quoting *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 882 (5th Cir. 1989)).  Because the scope of DOJ's investigation into the protection of LGBTI inmates is not limited to close and medium security facilities, and because each of the foregoing requests can reasonably be understood to be relevant to the investigation into treatment of LGBTI inmates, the petition should be **GRANTED** as to these requests.

### 3. Requests for Employee Separation Information and GDC SCRIBE Reports

GDC next object to Requests 9 and 10, seeking internal employee and inmate records.  Request No. 9 seeks:

> A list of, or documentation identifying, all security, medical, mental health, or supervisory Staff who have left employment with GDC in the past year, for any reason, including each person's name, title, date their employment began with GDC, date their employment ended, and reason for departure.

[Doc. 1-5 at 5.]  Request No. 10 seeks "Copies of systemwide GDC Scribe reports covering all dates from September 1, 2019 to the present."  [*Id.*]

GDC objects that the request for information about terminated staff is unduly burdensome and overbroad because GDC loses around 2,000 employees a year for various reasons, that about 400 of those separations are involuntary, and of that number, GDC estimates only one GDC employee has been fired in the past two

years for violating GDC's Prison Rape Elimination Act policies. [Doc. 14 at 40 (citing Decl. of Cliff Hogan [Doc. 14-4] ¶¶ 5-6).] Further, GDC asserts that it would take nearly thirty minutes per employee to search for the information that DOJ requested—meaning that it would take nearly 1,000 hours to compile information that appears to have no relevance to DOJ's investigation. [*Id.* (citing Hogan Decl. ¶ 7).]

As for the request for reports from SCRIBE, GDC's internal database, GDC argues that most SCRIBE reports pertain to topics that bear no relevance to DOJ's investigation. (*See* Decl. of Angela Ivester [Doc. 14-7] ¶ 3.) For instance, GDC points out that SCRIBE contains information about individuals who are no longer in custody, victim disbursements from inmate GDC accounts, inmate meals and dietary restrictions, information about inmate medical care, and other subjects not related to offender-on-offender violence or sexual violence against LGBTI offenders. [Doc. 14 at 39 (citing Ivester Decl. ¶ 11).] In addition, GDC contends that to compile and produce the SCRIBE reports that DOJ has requested, it would need to manually generate a report for each day for the period requested (*i.e.*, a report for each day between September 1, 2019 and December 14, 2021, for a total of 835 days); and that as a result, GDC estimates that it would take 2,000 hours to

retrieve, download, and produce the requested SCRIBE reports. [*Id.* at 39-40]; (*see also* Ivester Decl. ¶ 10).

The United States argues that information is relevant. It contends that information about staff termination is relevant because DOJ's investigation into the failure to protect inmates includes the effects of staffing shortages on inmate protection. [Doc. 16 at 13; *see also* Doc. 1-1 at 16.] Likewise, it contends that SCRIBE reports about subjects other than prisoner violence, such as medical care, transportation, and scheduling, are relevant because they may relate to treatment of injuries resulting from violence. [Doc. 16 at 12-13.] The United States also argues that GDC can avoid investing thousands of hours compiling records of employee terminations and SCRIBE reports simply by providing DOJ with access to the records. [*Id.* at 13 n.11.]

Because of the broad contours of relevance at play, the Court finds the United States' argument persuasive. Moreover, GDC's concerns as to the burden of sifting through and compiling SCRIBE records are alleviated if DOJ is permitted to simply have access to the information. Accordingly, the petition should be **GRANTED** as to these requests.

### 4. Request for Prisoner Handbooks, Orientation Materials, Etc.

Request No. 4 seeks:

> Prisoner handbook, orientation materials, prisoner education materials, posters, notices, handouts, brochures, and prisoner video presentations, including any materials informing prisoners of Policies for filing grievances, reporting [Prison Rape Elimination Act] allegations, or reporting prisoner-on-prisoner violence or fears or threats thereof.

[Doc. 1-5 at 5.] GDC argues that this request is overbroad because it seeks all posters, notices, handouts, or brochures provided to inmates, regardless of content. [Doc. 14 at 38.] It also explains that it has produced 80 pages of documents responsive to this request in connection with DOJ's informal document request in October and November 2021. [*Id.*; *see also* Doc. 1-28 at 8.] The United States does not explicitly respond to this argument, except to argue generally that "GDC cannot withhold responsive documents based on alleged overbreadth, burden, or disproportionality" because those "discovery-type objections" are inapplicable in a proceeding to enforce an administrative subpoena. [Doc. 1-1 at 19-20.]

Contrary to the United States' argument, this Court is not powerless to limit the scope of a particular request in an administrative subpoena, especially when it clearly seeks information that bears little, if any, relevance to a pending investigation. *See EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 761-62

(11th Cir. 2014) (affirming district court order narrowing scope of EEOC subpoena that sought company-wide information irrelevant to the investigation). Even so, the Court is mindful that CRIPA broadly authorizes DOJ to subpoena "***any*** document . . . relating to any institution that is the subject of an investigation . . . ." 42 U.S.C. § 1997a-1(a) (emphasis added). Even though this request is broad, it still seeks information that is relevant to the pending investigation. Importantly, the final clause of Request No. 4, which refers to "materials informing prisoners of Policies for filing grievances, reporting [Prison Rape Elimination Act] allegations, or reporting prisoner-on-prisoner violence or fears or threats thereof," leaves no doubt that this request is aimed at understanding what inmates are told (or are not told) about their rights to challenge acts or threats of violence. This information falls squarely within the scope of the pending investigation. Therefore, the petition should be **GRANTED** as to Request No. 4.[8]

---

[8] The Court notes that it appears the parties have not conferred about the scope of Request No. 4. It seems highly unlikely that DOJ really wants GDC to produce every single notice, poster, piece of education material, etc. that is furnished to inmates. To use an extreme example, "prisoner education materials" could be read to include school textbooks that are located within prisons—materials that obviously have no bearing on DOJ's investigation into prison conditions. The undersigned is confident that counsel for the parties can confer with success about the appropriate scope of this request.

### 5.    Technical Specifications of Production

Finally, in a letter dated October 27, 2021, DOJ requested that GDC produce information according to certain technical specifications and protocols. [Doc. 14-9 at 40-48.] GDC argues that these specifications are "arbitrary and burdensome" and "do not represent industry standard." [Doc. 14 at 41.] The subpoena, however, simply requests that GDC produce "documents and information . . . in a searchable electronic format." [Doc. 1-5 at 2.] The technical specifications in the October 27 letter are not part of the subpoena itself. Moreover, at oral argument, counsel for the United States stated that DOJ is willing to work with GDC concerning the format of a production. Accordingly, the Court cannot find a basis to quash the subpoena based on DOJ's October 27 letter.[9]

Having dispensed with GDC's specific objections, the Court now turns to its motion for protective order and its objections to producing sensitive, confidential information.

### C.    Motion for Protective Order

"District courts have discretion to enter a protective order in conjunction with enforcing an administrative subpoena." *Lear Corp. EEDS & Interiors*, 2016

---

[9] As with Request 4, it also appears that this is a matter about which the parties must still confer.

WL 11397056, at *5 (collecting cases).  The party seeking the protective order must establish "good cause," that is, "a sound basis or legitimate need to take judicial action." *Id.*  Factors relevant to this determination include "[1] the severity and the likelihood of the perceived harm; [2] the precision with which the order is drawn; [3] the availability of a less onerous alternative; and [4] the duration of the order." *Id.* (quoting *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987)).

The United States argues that a protective order is not necessary or appropriate in this case because "existing laws and regulations provide adequate protections for sensitive information."  [Doc. 17 at 3.]  Specifically, CRIPA itself provides that information DOJ obtains via an administrative subpoena:

(1) may not be used for any purpose other than to protect the rights, privileges, or immunities secured or protected by the Constitution or laws of the United States of persons who reside, have resided, or will reside in an institution;

(2) may not be transmitted by or within the Department of Justice for any purpose other than to protect the rights, privileges, or immunities secured or protected by the Constitution or laws of the United States of persons who reside, have resided, or will reside in an institution; and

(3) shall be redacted, obscured, or otherwise altered if used in any publicly available manner so as to prevent the disclosure of any personally identifiable information.

42 U.S.C. § 1997a-1(c); [Doc. 1-1 at 10; Doc. 17 at 3-4]. The United States further contends that other provisions of federal law, including the Freedom of Information Act, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, and DOJ's "Touhy" regulations, 28 C.F.R. §§ 16.21, *et seq.*, protect against the misuse or improper disclosure of sensitive information. [Doc. 17 at 4.] Likewise, regulations require DOJ to maintain and destroy identifying health information and limit the disclosure and use of such information. [*Id.* (citing 42 C.F.R. §§ 2.16, 2.53(f)).]

GDC nevertheless insists that it needs a protective order that, among other things, limits disclosure of certain information on an "attorneys'-eyes-only" basis—that is, prohibits the information from being viewed by anyone other than counsel without the prior permission of GDC. GDC argues that such a restriction is necessary to ensure that its sensitive and confidential information is protected against disclosure (inadvertent or otherwise). [Doc. 14 at 18-32.] GDC gives numerous examples of information that, if disclosed to the wrong person, could result in deadly or costly consequences, including information about GDC's facilities and security protocols, personal information about offenders, law enforcement investigations, and personal information about current and former staff members. [*See id.*]

GDC is understandably concerned about protecting nonpublic information about prison facilities, staffing, prosecutions, investigations, and the like. But it is also compelling that Congress, when it enacted CRIPA, chose to include specific protections for information that DOJ receives by way of administrative subpoena. Indeed, CRIPA explicitly prohibits DOJ from using any information obtained via subpoena for any purpose other than to protect the rights of inmates and bars DOJ from even transmitting the information within DOJ itself for any other purpose. 42 U.S.C. § 1997a-1(c)(1)-(2). While the Court appreciates GDC's emphasis on making sure that confidential, sensitive information is not disclosed or used for any purpose other than DOJ's investigation, the examples that it gives are hypothetical, and it has offered no reason or evidence that would lead the undersigned to believe DOJ intends to disclose the information in a manner that risks the security of GDC facilities, employees, or inmates.

GDC relies on the Eleventh Circuit's decision in *In re Secretary, Florida Department of Corrections*, 2020 WL 1933170 (11th Cir. Mar. 30, 2020), to support its position that courts that order disclosure of information about penal institutions "routinely issue protective orders limiting disclosure to an attorneys'-eyes-only basis." [Doc. 14 at 22; *see also* Doc. 15 at 3.] *In re Secretary* is

inapposite, however. That case was a class action brought by former and current inmates incarcerated in Florida correctional facilities alleging that the conditions of their imprisonment constituted cruel and unusual punishment in violation of the United States Constitution. 2020 WL 1933170 at *1. During discovery, class counsel and counsel for the Florida Department of Corrections ("FDC") attempted to negotiate a confidentiality order regarding the production of information about the prisons, but reached an impasse because the state wished to designate certain sensitive prison information as "Attorneys' Eyes Only." *Id.* The district court rejected the request, and entered a confidentiality order that "would have enabled the named plaintiffs—currently incarcerated inmates—along with several other groups of individuals to access all discovery without FDC permission." *Id.* The FDC filed a petition for a writ of mandamus with the Eleventh Circuit Court of Appeals, which was granted. *Id.* at *2-3. The Circuit Court explained that it granted relief out of concern that granting access to sensitive information to *currently incarcerated prisoners*—including inmates convicted of "murder in the first degree, armed robbery, identity fraud, forgery, and fleeing or attempting to elude law enforcement," presented "a clear and obvious security risk." *Id.* at *2. The court also found that the relief requested by FDC "was quite modest" because

it sought an "'Attorney's Eyes Only' designation only for a small subset of the prison information which would impair the security and safety functions of the prison if disclosed other than to plaintiffs' counsel." *Id.*

The concerns that underpin the decision in *In re Secretary* are much less pronounced here because this is an action to enforce an administrative subpoena by DOJ, and not a pending action by currently incarcerated prisoners. In a civil case, a party is typically entitled to discovery produced to his or her counsel because it is the client's case. But here, DOJ does not represent current or former inmates, and there is no reason to believe that DOJ would furnish sensitive information obtained via the subpoena to incarcerated individuals.[10]

---

[10] The other cases that GDC cites all involve civil or criminal proceedings where, absent a protective order, there would have been no guardrails against dissemination of sensitive information. Specifically, *Beebe v. Andrews*, No. 1:21-CV-00012-SLG, 2022 WL 621782, at *2 (D. Alaska Mar. 3, 2022); *Avery v. Wellpath, LLC*, No. 2:20-CV-00428-NT, 2021 WL 5500479, at *2 (D. Me. Nov. 21, 2021); *Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2020 WL 6781608, at *1 (D. Ariz. Nov. 18, 2020) and *Reese v. Liberty*, No. 1:18-CV-00421-JDL, 2019 WL 5549219, at *1 (D. Me. Oct. 25, 2019), are distinguishable as they restricted client access to sensitive information produced during discovery in a civil action, as opposed to a proceeding to enforce an administrative subpoena. Likewise, in *Johnson v. Federal Bureau of Prisons*, No. 16CV3919AMDCLP, 2017 WL 5197143, at *4 (E.D.N.Y. Nov. 9, 2017), which was also a civil action and not a suit to enforce an administrative subpoena, the Court found that a protective order restricting the Bureau of Prisons' use of the plaintiff's medical records was

GDC argues that it is of no moment that DOJ does not represent inmates because it "will conduct confidential interviews with GDC offenders" and, therefore, "GDC must assume that offenders will gain access" to any information that it produces to DOJ. [Doc. 18 at 12-13; *see also* Doc. 14 at 21 (stating that GDC "must assume" unauthorized disclosure of information will occur).] But such a "presumption runs contrary to the Supreme Court's instruction that administrative agencies are entitled to the presumption 'that they will act properly and according to law.'" *U.S. Dep't of Educ. v. Nat'l Collegiate Athletic Ass'n*, No. 106CV-01333-JDT-TAB, 2006 WL 3198822, at *8 (S.D. Ind. Sept. 8, 2006) (quoting *F.C.C. v. Schreiber*, 381 U.S. 279, 296 (1965)), *aff'd as to denial of protective order*, 481 F.3d 936 (7th Cir. 2007). Accordingly, the Court is simply unwilling to presume

---

appropriate, but left it to the parties to negotiate the terms of such an order. *United States v. Basciano*, a criminal case in which the court limited disclosure of cooperating witnesses to the defendant and the defense team, is similarly distinguishable because the information was provided in the context of a criminal prosecution with respect to which there would have been no other guardrails against dissemination. *See* No. 03-CR-929 NGG, 2007 WL 4555892, at *2 (E.D.N.Y. Dec. 19, 2007), *affirmed on reconsideration in part*, 2008 WL 123952 (E.D.N.Y. Jan. 11, 2008).

that DOJ will violate, either intentionally or inadvertently, CRIPA's prohibition on use and disclosures of information obtained via subpoena.[11]

GDC also makes much of the fact that DOJ has entered into nondisclosure agreements or consent protective orders with other prison systems. In 2018, for example, DOJ entered into a nondisclosure agreement with the Alabama Department of Corrections ("ADOC") and others that governed the informal production documents and information in connection with a CRIPA investigation. [Doc. 14-9 at 30-38.] Likewise, in *United States v. Alabama*, 2:20-cv-01971-RDP (N.D. Ala.), DOJ consented to the entry of a protective order similar to the one GDC proposes in this case. [*See* Doc. 14-9 at 119-35.] But these documents in separate proceedings do not compel the entry of a confidentiality protective order in this case. As an initial matter, the fact that DOJ has willingly agreed to a nondisclosure agreement or consent protective order in the past merely shows that

---

[11] Although GDC generally contends that the Freedom of Information Act, the Privacy Act, and DOJ's "Touhy" regulations are inadequate to protect against the misuse or improper disclosure of sensitive information [Doc. 14 at 31-32], these statutes—even if not as watertight as GDC would prefer—still provide an additional layer of protection on top of CRIPA. *Cf. Nat'l Collegiate Athletic Ass'n,* 2006 WL 3198822, at *10 (citing Privacy Act and Freedom of Information Act as providing additional safeguards against misuse or dissemination of information sought by Department of Education administrative subpoena).

DOJ is sometimes willing to enter into an agreement; it does not mean that DOJ is bound to do so in every CRIPA investigation. Beyond that, DOJ may have agreed to a protective order with ADOC because ADOC's production was voluntarily made, and therefore was not automatically subject to the protections of § 1997a-1(c), which apply to materials "obtained under a subpoena." *See* 42 U.S.C. § 1997a-1(c) (providing protection to documents and information "obtained under a subpoena issued under [CRIPA]"). Finally, *United States v. Alabama* also does not appear to have involved an administrative subpoena issued under CRIPA, but rather the production of information in discovery in connection with litigation over prison conditions in Alabama. (*See* Rogers Decl. ¶ 27.) Ultimately, that DOJ agreed to nondisclosure agreements or protective orders in different circumstances does not mean GDC is entitled to a protective order here.

At oral argument, counsel for GDC directed the Court to another Alabama case, *United States v. Dunn*, No. 2:18-mc-3837-WKW-GMB (M.D. Ala.), where the United States moved to enforce an administrative subpoena under CRIPA against ADOC. That case, however, provides little support for GDC's position because the parties resolved their disputes and the United States withdrew its petition before any court ruling. Dkt. No. 42, *United States v. Dunn*, 2:18-mc-

3837-WKW-GMB (M.D. Ala. May 30, 2019). Thus, the court in that case did not

rule one way or another whether ADOC was entitled to a confidentiality protective

order that extended beyond the protections already afforded by CRIPA.

GDC also argues that Georgia law imposes criminal penalties for the

disclosure of investigation reports and intelligence data prepared by GDC's internal

investigations unit since they constitute state secrets under Georgia law. [Doc. 14

at 28-29 (citing O.C.G.A. §§ 42-5-36(b), (f)).] GDC further points out that state

law protects the identity of confidential informants who cooperate in remedying

abuses and wrongdoing in the state penal system. [*Id.* at 29 (citing O.C.G.A. § 42-

5-36(a)).] As a result, GDC states that it "will not subject its employees to criminal

penalties for improper disclosure of this sensitive information without adequate

safeguards." [*Id.*] Notably, GDC does not take the position that it is ***prohibited***

from providing this information in response to DOJ's subpoena, but rather cites

state law as a reason why it wants enhanced protection against disclosure by DOJ.[12]

---

[12] To the extent that GDC contends that it is unable to provide this
information without violating state law, it is difficult to see how such state law
would not be preempted by CRIPA's broad authorization to DOJ to subpoena any
document relating to an investigation. *See, e.g., Marrache v. Bacardi U.S.A., Inc.,*
17 F.4th 1084, 1094 (11th Cir. 2021) ("Conflict preemption occurs where (1)
compliance with both federal and state regulations is a physical impossibility, or

But, as discussed above, CRIPA bars DOJ from using information in a CRIPA investigation for any purpose other than investigating the conditions in an institution. Moreover, it is important to keep in mind that the purpose of DOJ's investigation is to protect the safety of incarcerated individuals; thus, it stands to reason that DOJ's interests are aligned with those of GDC and Georgia law to protect the identity of inmates who complain about prison conditions.

For these reasons, then, GDC's motion for a protective order should be **DENIED**.

## III. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the United States' petition be **GRANTED** with the exception of Request No. 26 and that GDC's motion for protective order be **DENIED**.

It is further **RECOMMENDED** that if the District Judge adopts these recommendations, that GDC be **ORDERED** to produce documents responsive to the subpoena no later than **45 days** after entry of the order.

---

(2)'the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (citations and quotation marks omitted)).

IT IS SO RECOMMENDED, this 29th day of June, 2022.

_____

JOHN K. LARKINS III
United States Magistrate Judge